# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Adam Paul Nelson, | Case No. _____ |
| Plaintiff, | |
| | **COMPLAINT** |
| v. | |
| | JURY TRIAL DEMANDED |
| Geoffrey Kusick, acting in his individual capacity as a Crystal Police Officer, | UNDER FED. R. CIV. P. 38(b) |
| Defendant. | |

For his Complaint, Plaintiff Adam Paul Nelson ("Adam") hereby states and alleges as follows:

1.      This is an action for money damages for injuries sustained by Adam as a result of the unauthorized, improper, and unlawful use of deadly force on July 12, 2020, by Defendant Geoffrey Kusick ("Kusick"), a police officer with the City of Crystal.  The conduct of Kusick violated Adam's clearly established federal civil rights, all while acting under the color of state law.

2.      On the night in question, a suicidal Adam was pointing a gun at his own head and threatening no one but himself when Kusick opened fire without warning and for no reason, striking Adam nine times. Adam never moved the gun from his own head or pointed it at anyone but himself.  Kusick's bullets nearly killed Adam and left him with devastating, permanent injuries.

3.      The cause of action asserted herein arises purely out of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.  State-law claims

96093311.v1

and, by consequence, the limitations and defenses under state law are not applicable to this civil-rights lawsuit.

4.      Adam was, at all times herein, a citizen of the United States and a resident of the State of Minnesota.

5.      Upon information and belief, Defendant Kusick was at all times material herein, a citizen of the United States, a resident of the State of Minnesota, and a duly appointed and acting officer of the Crystal Police Department with a rank of Sergeant.  He is sued in his individual capacity.

6.      The City of Crystal is a municipality duly incorporated under the laws of the State of Minnesota.

7.      Adam brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3).  These statutory and constitutional provisions confer original jurisdiction of the Court over this matter.

8.      The events giving rise to this action occurred in the City of Robbinsdale, State of Minnesota.  Venue is thus proper under 28 U.S.C. § 1291(b)(2).

**JULY 11-12, 2020**

9.      At times during his life, Adam has suffered from mental-health issues.  He was profoundly affected by the suicide of a close friend.

10.     In July 2020, Adam was 29 years old.  He resided with his brother, Brent, and sister-in-law, Alison, at 3343 France Avenue North in Robbinsdale, Minnesota.

11.     The residence is a grey single-family, two-story home just to the south of another home at 3349 France Avenue, shown below:



*Figure 1. Google Map Image*



*Figure 2. BCA Scene Photo*

12.     On the evening of July 11, 2020, Adam was home alone at the residence while Brent and Alison were out at a friend's place.

13.     There, Adam consumed alcohol and texted a friend that he was sorry.

3

14.    Adam then seemed off in a follow-up telephone conversation with the same friend.

15.    Out of concern for Adam's well-being, his friend contacted Brent to inform him of the text message and odd telephone call he had with Adam.

16.    Similarly concerned for Adam, Brent and Alison left their friend's place and returned home.

17.    On their drive home, Brent talked to Adam on the phone a few separate times.

18.    Adam became frustrated with Brent continuing to check on him.

19.    Upon arriving home, Brent went upstairs where he first sought to locate Adam's gun, which Brent and Alison had been storing in their bedroom.

20.    When Brent checked, Adam's gun was not in their bedroom.

21.    Brent then went to check on Adam – first knocking and then entering Adam's room.

22.    Brent found Adam lying in bed with the gun resting on his stomach.

23.    The brothers spoke for some time in Adam's room.

24.    At times, Adam held the gun to his own head.

25.    Adam never threatened Brent.

26.    Adam never threatened to harm anyone else besides himself.

27.    Adam eventually promised to give Brent the gun if he promised not to call the police.

96093311.v1

28.     But Adam's friend had called 911 and noted Adam was suicidal, which caused police officers to be dispatched to 3343 France Avenue North.

29.     Around 11:40 pm, four officers from the Robbinsdale Police Department (Robert Staycoff, Sergeant John Kaczmarek, Brenden Dowd-Sivigny, and his Field Training Officer Robert Kaehn) arrived on scene for what the officers understood to be a welfare check.

30.     Upon arriving to the scene, Staycoff found Alison outside and spoke with her to learn about Adam's background and the evening's situation.

31.     Upon his arrival, Kaczmarek joined Staycoff and Alison's conversation.

32.     Both Kaczmarek and Staycoff asked Alison questions to learn more about the situation at hand.

33.     Upon their arrival to the scene, Kaehn and Dowd-Sivigny likewise engaged in conversation with Alison to learn about the situation.

34.     Kaczmarek, as a Sergeant with Robbinsdale Police Department, was the scene supervisor.

35.     Kaczmarek was an experienced officer.  He spent five years as a Patrol Officer; two years in Investigations; seven years as a SWAT Operator; had previously served as a Field Training Officer; and had been a Patrol Sergeant for nearly six years.

36.     The brothers continued to remain in their home.

37.     At various points after their arrival, the Robbinsdale officers allowed Alison to go back into her home.

38.     According to Alison, who had been inside her home prior to the officers' arrival and at various points after their arrival, the discussions between the brothers had been somewhat calm.

39.     But, according to Alison, Adam did not want the police to be called.

40.     For this reason, the Robbinsdale officers decided they would not enter the residence.

41.     The officers further decided to let the brothers' conversation continue inside the home.

42.     The officers obtained both Adam's and Brent's telephone numbers from Alison.

43.     The brothers continued to remain in their residence.

44.     Eventually, Kaczmarek called Brent.

45.     Brent answered Kaczmarek's call.

46.     Kaczmarek could hear Adam in the background during the call.

47.     Adam seemed concerned with who Brent was speaking to on the phone.

48.     In this call, Brent confirmed to Kaczmarek that Adam was in possession of a gun.

49.     Brent eventually hung up on Kaczmarek.

50.     The brothers continued to remain in their residence.

51.     Later, Kaczmarek directed Staycoff to send Brent two text messages, which both went unanswered.

96093311.v1

52.     After nearly 20 minutes on scene, Kaczmarek requested Crystal police to respond to the scene with: 1) a ballistic shield; and 2) a less-lethal weapon, devices that are often used to lessen the need for any deadly force response.  Notably, Kaczmarek did not request that a sub-machine gun be brought to the scene.

53.     The following officers from the Crystal Police Department arrived on scene separately for Adam's "mental problem":

- Officer Antoine Martin at 12:03:40 am; and

- Defendant Geoffrey Kusick at 12:03:51 am.

54.     Martin responded with a Remington Model 870 Magnum 12-gauge shotgun set up to fire beanbag rounds and, as such, was a less-lethal force alternative.

55.     Defendant Kusick responded with a ballistic shield and a Heckler & Koch Model MP5 9mm Luger caliber sub-machine gun loaded with hollow-point bullets.

56.     Upon arriving to the scene, Kusick donned his "heavy armor," which comprised an additional vest and a combat helmet, in addition to carrying his sub-machine gun.

57.     No other officer on scene donned a combat helmet or put on heavy armor.

58.     All other officers were armed with their service weapons, which were pistols.

59.     Kusick chose to remove his body-worn camera (BWC) from the front of his uniform and place it in his pocket, claiming the heavy armor is not outfitted for wearing a BWC.

60. Crystal Police Department's BWC policy states: "The primary purpose of using body-worn-cameras (BWCs) is to capture evidence arising from police-citizen encounters" and that compliance with the policy is **mandatory**.

61. Crystal's policy on using BWCs provides: "All police officers working uniform patrol, uniform special details, traffic duties and uniform school resource duties **shall** use a BWC *unless* permission has been granted by a supervisor to deviate from this clause." (emphasis added).

62. Not wearing a BWC in a SWAT, tactical or other critical-incident situation (which Crystal's policy notes includes officer-involved shootings) defeats the defined purpose of police officers being equipped with BWCs and is *against* policy.

63. In this and other occasions where excessive force is used, officers planning to use force – deadly or nondeadly – have been known to try to obscure the BWC images and audio.

64. Kusick's BWC remained in his pocket for much of the evening, including when he used deadly force on Adam.

65. Kusick's BWC did not capture any meaningful images, but its recorded audio provides evidence that supports Adam's claim.

66. The Nelson brothers continued to remain in their residence.

67. Notably, from his observations and knowledge obtained from being present at the scene, Kaczmarek, the on-scene supervisor, determined no crime had been committed.

68. Kaczmarek determined no one felt threatened.

69. Kaczmarek determined no one felt endangered.

70.    Kaczmarek determined Alison was not afraid for herself or her husband.

71.    Kaczmarek determined there was no probable cause to make any arrest.

72.    Kaczmarek determined Alison *was* worried about Adam.

73.    Kaczmarek determined Adam *was* suffering with his mental health.

74.    Kaczmarek determined Adam *was* within his own right to have his own gun in his own home.

75.    Kaczmarek determined the continued best course of action for the officers was not to force the issue with their presence.

76.    Kaczmarek vocalized all of the above observations and conclusions to the other officers that remained near him, namely Staycoff, Martin, and Kusick.

77.    Kaczmarek can be heard stating the following on Kusick's BWC:

So what we got is no crime, in his own house, with his own handgun, suicidal, in his own bedroom, she says she's not in danger, she says [Brent] is not in danger, he's not responding to us, we attempted to contact the guy and he doesn't want us in there, we don't want to escalate the situation, we don't want to go in, he says that they're talking . . . I don't know that we do that much more, to be honest with you.

78.    Staycoff, Martin, and Kusick all agreed with Kaczmarek's assessment and conclusions regarding the situation.

79.    Despite deciding not to "force the issue," the officers wanted to make contact with Adam and/or Brent to see how things were going inside – was everyone safe?

80.    Staycoff called Adam directly.

81.    Around the time of this telephone call, Kaczmarek had Staycoff, Martin, and Kusick moved further to the north to distance themselves from Adam's residence.  This

way, they could inform Adam that while they were nearby, if needed, they weren't even on his property.

82.     Kaczmarek likewise moved north into the neighbor's front yard.

83.     Kaczmarek, Staycoff, Martin, and Kusick congregated in the neighbor's front yard, to the north (righthand side) of a tree indicated below:



*Figure 3. BCA Scene Photo*

84.     For much of the time spent by this group of four officers in the neighbor's yard, they did not position themselves in any tactical array.

85.     Much of the time, this group of four officers in the neighbor's yard did not position themselves in a manner reasonable officers expecting a deadly force encounter would assemble.

86.     Much of the time, this group of four officers in the neighbor's yard did not take "cover" behind a tree.

10

87.    For periods of time, the officers in the neighbor's yard had their backs turned to 3343 France Avenue North, including Kusick.

88.    Around the time that the officers moved into the neighbor's yard, Down-Sivigny and Kaehn had been tasked with escorting Alison up the street.

89.    While in the neighbor's front yard, Kaczmarek reiterated to the group of officers congregated together – including Kusick – that because there was no crime and neither Alison nor Brent felt they were in danger, the officers' best course of action was likely to simply leave.

90.    Shortly thereafter, the brothers exited their residence via the front door (shown below), with Adam following shortly behind Brent.



*Figure 4. BCA Scene Photo*

91.    The officers turned their attention to Brent when he exited the front door.

11

## EVENTS INVOLVING THE UNCONSTITUTIONAL USE OF DEADLY FORCE ON ADAM P. NELSON BY DEFENDANT GEOFFREY KUSICK

92.    The entrance of 3343 France Avenue North was well lit.

93.    The porchlight of 3343 was on.

94.    There was an overhead streetlight.

95.    Further, the yards of both 3343 and 3349 France Avenue North were well lit.

96.    Upon exiting his residence, Brent walked toward France Avenue North.

97.    The four officers in the neighbor's yard positioned themselves with two

officers flanking each side of the tree.

98.    The four officers fanned out from the tree in nearly a flying-V formation, with

the tree as the point of the inverted V.

99.    According to BWC video and the officers' statements to the Minnesota

Bureau of Criminal Apprehension (BCA), the officers' general positions in the neighbor's

yard were as follows:



100.    Upon leaving the residence, Adam stood on the sidewalk leading to the steps

of the front entrance of the house.

101.    Adam had his gun in his right hand.

102.    Adam was pointing his gun **at his own head.**

103.    Shortly after Adam exited the residence, the four officers in the neighbor's yard, including Defendant Kusick, could see that Adam was pointing a gun at his head with his right hand.

104.    Shortly after the brothers exited their home, Kaehn took a position behind the hood of a vehicle parked facing south on France Avenue North.

105.    Kaehn was nearly perpendicular to the officers grouped in the neighbor's yard.

106.    Adam and the officers are depicted in the below still from Kaehn's BWC:



107.    The above still-frame from Kaehn's BWC also shows that officers in the neighbor's yard were using equipment to further illuminate Adam.

108.    Upon noticing that Adam had the gun, a number of officers at the scene yelled: "gun!"

109.    Contrary to their training and common sense, multiple commands were given to Adam by various officers, including:

- "Put the gun down";

- "Talk to me"; and

- "Listen to me."

110.    Adam continued to stand on the sidewalk leading to the steps of the front entrance of the house.

111.    Adam continued to point his gun at the right side of his head with his right hand.

112.    The below still frame from Kaczmarek's BWC shows Adam's positioning outside of his home with his right hand pointing the gun at his head:



113.    Staycoff calmly tried to engage Adam in conversation, including by stating the following:

- "We don't want to hurt anyone";

- "I just want to talk";

- "What can I do to help you man"; and

- "What can I do for you".

114.    Adam continued to stand on the sidewalk leading to the steps of the front entrance of the house.

115.    Adam continued to point his gun at the right side of his head with his right hand.

116.    Eventually, Adam began walking towards the officers.

117.    Adam continued to point his gun at the right side of his head with his right hand while he walked.

118.    Again, multiple commands were given to Adam by multiple officers, including:

- "Back up";

- "Stop";

- "Stop where you're at"; and

- "Listen to me".

119.    Adam continued walking towards the officers.

120.    Adam continued to point his gun at the right side of his head with his right hand.

121.    Staycoff, recognizing that the circumstances did not support the use of deadly force, calmly directed Martin to use the less-lethal shotgun.

122.    Kaczmarek, also recognizing that the circumstances did not support the use of deadly force, directed Martin to use the less-lethal shotgun.

123.    Adam continued to point his gun at the right side of his head with his right hand.

124.    Kusick volitionally aimed his sub-machine gun at Adam.

125.    Kusick volitionally moved the sub-machine gun's safety selector off of the "safe" position, past the semi-automatic (single-shot) fire position, and into the "Navy-3 burst" fire position.

126.    Kusick volitionally inserted his finger inside the trigger guard, into the trigger-engagement position.

127.    Kusick was trained, as all officers are, that he was not to put his trigger finger into the trigger-finger engagement position until he intended to use deadly force.

128.    Kusick volitionally exerted the required 6 to 6 ½ pounds of pressure on the trigger to fire his sub-machine gun in a "Navy 3-Burst" at Adam, firing three bullets with one pull of the trigger.

129.    Kusick then released the trigger on his sub-machine gun, allowing the firing mechanism to reset, before volitionally exerting the required pressure on the trigger to fire a second 3-shot volley from the sub-machine gun at Adam.

130.    Kusick then released the trigger on his sub-machine gun, allowing the firing mechanism to reset, before once more volitionally exerting the required pressure on the trigger to fire a 3-shot volley from the sub-machine gun for a third and final time at Adam.

131.    *All nine* of Kusick's shots struck Adam.

96093311.v1

132.    Kaczmarek described to the BCA that right after he called for less lethal, Martin with the less lethal came out around him, and "as soon as that happened," Kaczmarek "heard shots" from Kusick.

133.    At the time Kusick shot Adam, Adam's hands were observable to all law enforcement officers in the front yard of 3349 France Ave North.

134.    At the time Kusick shot Adam, Adam's hands were observable to Kaehn and Brent.

135.    At the time Kusick shot Adam, Adam's right hand held his gun, pointed at his own head.

136.    The below still-frame from Kaczmarek's BWC shows Adam's right hand pointing the gun at the right side of his head immediately before he was shot:



137.    Similarly, the below still-frames from Staycoff's squad vehicle camera show Adam's right hand pointing the gun at the right side of his head immediately before he was shot:

96093311.v1





18

138.    Every non-shooting officer who could see Adam at the time he was shot agrees that **at the time he was shot**, Adam's right hand was pointing his gun at his own head.

139.    Kaczmarek stated to the BCA on July 12, 2020, that Adam "had the gun to his head," and Kaczmarek "was uneasy that he was gonna take the gun from his head."

140.    Notably, Kaczmarek did not say that Adam ever *did* take the gun from his own head prior to Kusick firing.

141.    Nor did Kaczmarek say that his ex-post-facto uneasiness changed any of his own volitional acts.

142.    Staycoff stated to the BCA on July 12, 2020: "He still had the handgun to his head.  And then I heard shots.  I knew it wasn't the suspect, 'cuz I could see him the entire time with the gun still to his head."

143.    Kaehn stated to the BCA on July 12, 2020: "[t]he last time I saw [the gun], it was pointed at his head."

144.    Martin stated to the BCA on July 12, 2020: "He's still walking towards us.  He had the gun to his head…he's still walking.  Second later um shots are uh yeah."

145.    Brent was watching Adam the entire time they were outside and stated the following in his interview with the BCA:

| | |
|---|---|
| BP | How, how was Adam holding the gun when he was walking around outside? |
| BN | To his head. |
| BP | To his own head? |
| BN | Yeah. |
| BP | How about when the shots rang out? |
| BN | It was, never left his head.  It was always at his own head. |

19

146.    The BCA agents who viewed the video also agreed that Adam's right hand was pointing his gun at his own head at the time he was shot by Kusick.

147.    Agent Robert Santoro, in reviewing Staycoff's squad video, noted: "The white male had his right arm and hand extended upwards towards his head (Stream 1).  The white male continued to walk towards the officers and then gunshots were audibly heard."

148.    Agent Talisha Barlow, in her review of Kaczmarek's BWC video, noted: "At Approximately 00:23:42, Adam begins walking towards officers with the gun still pointed towards the right side of his head. Officers yell 'stop,' 'back up,' and 'stop,' but Adam continues to quickly walk towards them. At approximately 00:23:44, an Officer yells 'less lethal, less lethal.' Approximately 3 to 4 apparent gunshots are heard as Adam falls onto the ground."

149.    At the time Kusick fired his nine shots at Adam, he posed no threat to anyone but himself.

150.    At the time Kusick fired his nine shots at Adam, Adam had not pointed the gun at anyone but himself.

151.    At the time Kusick fired his nine shots at Adam, Adam had not made any threats to harm anyone but himself.

152.    At the time Kusick fired his nine shots at Adam, Adam had not wielded the gun in any menacing fashion toward any officer or bystander.

153.    Adam was merely suicidal.

154.    Recognizing this, no other officer on the scene either fired his weapon or reported to the BCA that his finger was in a trigger-engagement position.

20

96093311.v1

155.    Kusick's shooting of Adam constituted a seizure by deadly force under the United States Constitution.

156.    Kusick's use of deadly force was objectively unreasonable given the circumstances.

## OTHER OFFICERS VOTED WITH THEIR TRIGGER FINGERS

157.    Given the totality of the circumstances, no reasonable officer would have believed deadly force was justified—and no reasonable officer on the scene *did*.

158.    Staycoff consciously chose not to fire his lethal weapon at Adam.

159.    Kaczmarek consciously chose not to fire his lethal weapon at Adam.

160.    Kaehn consciously chose not to fire his lethal weapon at Adam.

161.    In his BCA interview after the shooting, Martin claimed that he fired his *less-lethal* shotgun, but this after-the-fact claim is belied by the evidence collected by the BCA and the BWC audio and video evidence from the scene.

162.    The BCA collected evidence from the scene.

163.    Item number 7 was described as follows

**Item # 7**
Remington 870 12Ga Less-Lethal
SN: W310568M
Safety Off
3 shot shells in magazine, one shot shell in chamber
Recovered from Crystal PD Squad #204

164.    The following photograph shows the condition of the less-lethal shotgun on scene:

21



*Figure 5. BCA Scene Photo*

165.    The following photograph shows the condition of the less-lethal shotgun in

the evidence collection box:



*Figure 6. BCA Scene Photo*

166.    The following photograph shows the condition of the less-lethal shotgun and

the extracted shot shell from its chamber:

96093311.v1



*Figure 7. BCA Scene Photo*

167.    The following photograph is a close up of the shot shell extracted from the

less-lethal shotgun:



*Figure 8. BCA Scene Photo*



168.    There is no physical evidence on the extracted shot shell indicating that it was fired.  The shell remains intact, its physical appearance is unchanged and its less-lethal beanbag still inside.

169.    There is no contemporaneous statement by Martin indicating that he pulled the trigger of the less-lethal shotgun and that it failed to fire.

170.    While on scene, Martin disclaimed that he shot the less-lethal shotgun, as captured on BWC.

171.    Suspiciously, Kusick offered to drive Martin back to the police station after the shooting.

172.    This constitutes an obvious breach of critical-incident scene protocol.  The shooter is supposed to be separated and told not to speak to anyone.

173.    No reasonably trained critical-incident scene investigator would ever let Martin and Kusick have a conversation, and both would have been separated immediately.

24

174.   After arriving to the police station and after speaking with an attorney, Martin claimed for the first time: "I raised the less lethal.  Aimed at…down range.  My sights were right on chest.  Pull the trigger.  Nothing happens."

175.   The BCA tested Martin's less-lethal shotgun on September 16, 2020, as part of its investigation.

176.   The BCA's testing found that the less-lethal shotgun and safety mechanisms were functional.

177.   The BCA's testing found that the trigger pull of the Remington Model 870 Magnum 12-gauge shotgun was from 3 to 3 ½ pounds +/- 1 pound with a level of confidence of 95.45%.

178.   There is no physical evidence, from the testing of the shotgun or otherwise, giving credence to Martin's claim that he attempted to fire the less-lethal shotgun but it did not work.

## ACUTE INJURIES & TREATMENT

179.   The use of deadly force by Kusick resulted in life-threatening and permanent injuries to Adam.

180.   At 12:23:56 am, shots fired was aired over the police radio.

181.   At 12:24:27 am, "3826 NORTH NEED ED NOW" was aired.

182.   At 12:25:47 am, "3805 C4 FOR NORTH" was aired – meaning the scene was safe for the emergency personnel's arrival.

183.   After being shot nine times by Kusick, Adam took several steps and then collapsed onto the ground.

184. Brent, having just watched his brother get shot by the police, started yelling "no! no!" and "Someone help him now! Someone help him now!" He added, "I fucking had this under control. You guys are fucking professionals?"

185. It was immediately obvious that Adam was very critically injured as he laid moaning and screaming out in pain on the grass.

186. Staycoff and Kaczmarek rushed towards Adam after several seconds, initiating lifesaving efforts.

187. Kusick stood by, taking no action to provide aid to Adam, seemingly unfazed by his screams.

188. Kusick was instead worried about the location of Adam's gun.

189. North Memorial emergency personnel arrived on scene and quickly got Adam into the ambulance.

190. Adam was convinced he was going to die, saying that repeatedly to those attempting to stop the bleeding from his gunshot wounds.

191. Given his residence's close proximity to North Memorial, Adam's ambulance ride was short but not without agony, which was captured on Staycoff's BWC (as he rode with Adam in the ambulance).

192. Adam presented to the North Memorial emergency department in critical condition with nine gunshot wounds (GSWs).

193. Adam had sustained GSWs to his abdomen, left and right chest, left shoulder and left forearm.

96093311.v1

194.    The emergency department activated "full trauma" shortly upon Adam's arrival, signifying the need for a rapid, organized response by a specialized trauma team to manage the severely injured Adam.

195.    Adam was pale, diaphoretic, in distress, and quickly losing both consciousness and his airway.

196.    Adam was intubated.  Simultaneously, his circulation was supported with a trauma catheter.  Further, massive transfusion protocol was initiated and he was started on platelets.

197.    A Focused Assessment with Sonography in Trauma – a FAST examination (which aids in the quick assessment and management of potentially life-threatening injuries) – showed fluid in Adam's pelvis.

198.    There was also subcutaneous air in Adam's chest.

199.    Examination of Adam's chest wounds revealed rib fractures in the right anterior ribs, indicating likely pneumothorax.  Bilateral chest tubes were inserted, with 300 ml of blood coming out of the right chest.

200.    After massive resuscitation, Adam maintained permissive hypotension and it was decided that Adam would be taken to the operating theater for trauma to perform an exploratory laparotomy – a surgical procedure involving a large incision in the abdominal wall to allow trauma to examine and potentially repair and remove organs inside the abdominal cavity.

201.    Adam was sedated and sent straight to the operating room with the trauma team, where they planned to deal with his abdomen, hypotension, and acute blood loss, first.

96093311.v1

202.    The trauma team was aware of Adam's forearm and left shoulder injuries, but those would be left for later as they tried to save his life.

203.    Initially, in the operating room on July 12, 2020, Adam underwent the following procedures:

- Exploratory laparotomy;
- Right medial visceral rotation with Kocher maneuver;
- Ileocecectomy (removal of parts of both the large and small intestine);
- Small bowel resection x 2;
- Small bowel enterotomy repair;
- Packing of liver injury;
- Gastrotomy repair x 2;
- Temporary abdominal closure with abthera device;
- Washout and stapled closure of right chest wall wounds x 2-2 cm and 3 cm; left axillary wounds 3 cm and 2 cm, 1 cm suprapubic wound; and
- Repair of right rectus fascia traumatic defect – 5 cm.

204.    Post-operatively, Adam was diagnosed with multiple gunshot wounds to chest, left arm, and abdomen with the following findings:

- Multiple destructive wounds to the distal jejunum and ileum;
- Large de-vascularizing mesenteric injury to the ileocecal area;
- Enterotomy to the mid-jejunum;
- 3 cm anterior gastric wound;
- 3 cm posterior gastric wound;
- Grade 3 liver laceration; and
- 4 cm anterior abdominal wall defect to the right of midline.

205.    However, that was not all. Adam's active problems also included: hemorrhagic shock; acute kidney injury; liver laceration, grade III with open wound into cavity; right rib fracture; fracture of right acetabulum; hypophosphatemia; respiratory failure following trauma and surgery; right and left pneumothorax; traumatic injury of stomach; and S/P small bowel resection.

206.     Due to his injuries, Adam experienced a prolonged period of critical illness.

207.     Adam remained hospitalized at North Memorial for seventy-three days.

208.     Adam had been on mechanical ventilation.  He also underwent a
tracheostomy.

209.     Adam's hospital course was further complicated by the following: entero-
atmospheric fistula; bile and stool leak; infections; additional operations; his multiple open
wounds requiring frequent wound vac changes; septic shock and pressor treatment; pleural
effusions; seromas; the retraction of the ostomy; purulent drainage; numbness in portions of
upper extremity; and fistulas, among other serious medical issues.

210.     During Adam's hospitalization at North Memorial, he was monitored
frequently by North Memorial trauma personnel.

211.     Outside of the trauma team, Adam was also consulted by several specialists,
including but not limited to:  infectious disease, orthopedics, trauma surgery, physical
therapy, occupational therapy, speech therapy, and psychology.

212.     Unfortunately, Adam's medical problem list would only continue to grow and
evolve.

213.     As of September 9, 2020 – day 59 of his hospitalization at North Memorial –
Adam's *active* problems list included:

- Gunshot wounds;
- Type III open fracture of left forearm;
- Liver laceration grade III with open wound into cavity, initial encounter;
- Open fracture of one rib of right side;
- Open fracture of right acetabulum;
- Respiratory failure following trauma and surgery;
- Right pneumothorax;

29

- Left pneumothorax;
- Gastrotomy;
- Enterotomy;
- High output ileostomy;
- Seroma due to trauma;
- Moderate malnutrition; and
- Acute post-traumatic stress disorder.

214. Just weeks later, on September 23, 2020, Adam was discharged from North Memorial to the rehabilitation center at Regency Hospital for long-term acute care to manage his continuing and complex medical conditions.

215. Due to Adam's complicated medical conditions, it took much negotiation and approval from regional leadership and legal for Adam to be approved for acceptance to Regency Hospital.

216. Upon his discharge to Regency, Adam had multiple open wounds.

217. Adam received daily dressing changes for his wounds at Regency, among other cares ahead of his discharge home, including but not limited to: physical and occupational therapy.

218. Adam also required follow-up visits to North Memorial, where the wounds were monitored for infection and progression towards closure.

219. Adam was discharged from Regency to his parents' home on October 15, 2020, more than three months after the shooting.

220. Adam's discharge home was certainly not the end of the treatment for his severe, persisting physical injuries. Adam frequently followed up with trauma, orthopedics, nursing, and physical therapy.

96093311.v1

221.    These initial follow-up appointments included but were not limited to: addressing continued and increasing pain; wound care; infection care; monitoring his diaphragm paralysis; and physical and occupational therapy to help his daily functioning.

222.    Adam likewise frequently attended follow-up appointments as they related to his mental-health issues, which were complicated and exacerbated by the July 12, 2020 shooting.

223.    Upon discharge from Regency, and up to the present, there were five main categories of Adam's physical injuries that were painful and particularly complex and prolonged his path to healing – namely: 1) his open wounds; 2) his orthopedic injuries; 3) his entero atmospheric fistula; 4) laparostomy ventral hernia; and 5) the bullets and bullet fragments that remained in his body.

224.    Mentally, Adam was still struggling.

225.    Adam further continued to deal with chronic, severe, multifaceted pain.

## ORTHOPEDIC INJURIES

226.    In October 2020, three months after the shooting, Adam followed up at Twin Cities Orthopedics for his orthopedic injuries.

227.    The following images show the status of some of the bullets and bullet fragments that remained in his body, as well as the surgical intervention required for his left arm:



228.    In December 2020, he suffered a bacterial infection at his *still* open wound at the surgical site of the orthopedic surgery on his left forearm.

229.    In March 2021, the bones in Adam's left forearm showed various areas concerning for infection.

230.    On April 1, 2021, Adam underwent surgery for the removal of the hardware originally placed in his left arm and placement of stimulant beads.  Post-operatively, Adam was diagnosed with osteomyelitis of the left radius and ulna.  Infectious disease was consulted and Adam was again put on antibiotics to treat his bone infection, which would require approximately an 8-week course.

231.    Adam was discharged home on April 6, 2021, but required additional follow-up appointments with orthopedics and infectious disease.

232.    The below imaging shows Adam's left arm from April 22, 2021, post-hardware removal and his obvious, continued deformities:



233.    Months post-hardware removal, Adam's left forearm was painful and had a malformation.  Adam had lost a measure of bone, which also caused significant pain.

234.    He continued to follow-up at North Memorial but also consulted the Mayo Clinic for his medically complicated left-forearm issues and ideas for reconstruction.

235.    On October 14, 2021, Adam obtained a second opinion at the Mayo Clinic regarding his left wrist orthopedic injuries and continued deformity.  Imaging revealed malunited fractures of the distal left radial and ulnar shafts marked with apex lateral angulation; overlying metallic shrapnel; ununited fracture of the ulnar styloid; degenerative changes at the ST joint; and presumed arthrodesis of the trapezium-trapezoid joint.

236.    A later 3D CT showed chronic ununited displaced angulated forearm fractures with no significant bridging bone formation across the fractures; patchy osteosclerosis about the epicenter of the fractures with local extension more pronounced about the radial shaft

which is nonspecific reactive inflammatory change.  It was noted that Adam's chronic infection/osteomyelitis could also have this appearance.

237.    A staged surgical approach was recommended, after Adam was cleared by Infectious Disease.  The first surgery would attempt to correct the deformity with an external fixator for provisional stability and allow for obtaining bone and tissue for culture at the radius and the ulna.  Absent infection, the second surgery would include reconstruction, hopefully within the first month after surgery, with bone grafting and repeat plate fixation.

238.    The below photographs depict Adam's left arm at or around the time of his November 2, 2021 visit:

  

239.    Adam underwent the first stage of the orthopedic procedure at Mayo Clinic on February 14, 2022, and the second stage on March 3, 2022.  Between the surgeries, Adam was followed closely by Mayo Clinic Infectious Disease.

240.    Adam required additional follow-up care and treatment relating to his left-arm injuries and complications therefrom, including clinic visits, physical therapy, and orthosis.

241.    Adam continued to work on his home therapy exercises for his left arm – pronation and supination, finger flexion, and thumb opposition.

242.    To date, Adam continues to experience constant bone and muscle pain.

243.    Adam also suffered nerve issues in his left arm and at times has shooting nerve pain in his left arm.

244.    Adam's range of motion, grip strength, and ability to lift objects remain severely limited due to the orthopedic injuries he suffered and the extensive treatment therefor.

245.    The limitations negatively impact Adam's daily life – from school to cooking. His left arm tires much faster than his right and he finds himself frequently needing to take breaks, stretch or loosen the left wrist, or find workarounds.

246.    Adam's left arm remains scarred.

## FISTULA & HERNIA

247.    Adam's abdominal pain continued following his discharge from Regency to his parents' home.

248.    In early 2021, as discussions were had regarding the possibilities of definitive surgery for his still-open abdomen and numerous internal issues stemming from the GSWs, Adam sought a second opinion at the Mayo Clinic.

249.    In February 2021, the Mayo Clinic evaluated Adam's entero atmospheric fistula and ventral hernia, and his complex injuries, treatment course and complications.

250.    It was decided that the Mayo Clinic would monitor Adam's progression with the plan for a delayed and separate closure of the wounds, as feasible, starting with the fistula operation.

251.    From the evaluation of the medical personnel at Mayo, the hernia could not be repaired at the time of the fistula takedown.

252.    On September 14, 2021, Adam underwent his first abdominal surgery at the Mayo Clinic which included:

- Enterolysis (2 hours)
- Excision of tiny midline subcutaneous abdominal wall abscess
- Primary closure of enterocutaneous fistula
- Takedown of end ileostomy
- Takedown of end transverse colon mucous fistula
- Reestablishment of intestinal continuity with an ileo-transverse colostomy
- Excision anterior abdominal wall scar, 50 sq cm
- Development of cutaneous/subcutaneous advancement flap, 40 sq cm, over the left costal margin
- Primary cutaneous closure

253.    The September 14, 2021 surgery was "substantially more difficult than usual because of significant effort and difficulty mobilizing and identifying anatomical structures due to [Adam's] altered surgical field secondary to distorted anatomy and previous surgery."

254.    Adam's abdominal fascia was unable to be closed completely.

255.    Tissue cultures from surgery grew pseudomonas and Adam required additional treatment for the infection.

256.    Adam's abdominal pain continued.

257.    As of May 2022, the abdominal pain had been ongoing for nearly two years.

258.    Adam was working closely with a psychiatrist who was hopeful that a pain clinic might be able to help Adam with non-pharmaceutical pain-control methods for his ongoing, chronic pain.

259.    Adam had tried the following to aid with his chronic pain: acetaminophen, gabapentin, oxycodone, trazodone, PT, and marijuana edibles.

260.    Adam had realistic views of treatment goals – he wanted to take the edge off the pain so he could function at a higher level.  Adam did not want the pain to dominate his behavior.

261.    Upon examination, the Mayo pain clinic noted that Adam's abdominal pain was largely mechanical/incidental and too diffuse to treat with trigger point injections. Additional treatment options were explored from medication to Wellness Counseling.

262.    The abdominal pain continued to impact Adam's ability to perform activities of daily living.  Since the shooting, Adam had been restricted in what he could lift.  Even as of May 2022, Adam was on a 20-pound lifting restriction.  He had many other restrictions during his treatment course.

263.    Adam continued to experience sleep disruptions from pain.

264.    Leisure and socialization have been impacted by pain and Adam was more isolated.

265.    On October 7, 2022, Adam underwent transversus abdominis plane block bilaterally with ultrasound guidance to help with his chronic pain.

266.     In early 2023, Adam's abdominal pain persisted and even increased, despite the injections and physical therapy.

267.    Adam continued to be seen at Mayo Clinic regarding his ongoing abdominal pain and a variety of providers were consulted regarding how best to proceed with his massive ventral hernia.

268.    Additionally, Adam was referred to endocrinology regarding weight and nutrition – both of which fluctuated greatly over the course of his treatment and recovery from the multiple GSWs – in preparation for his hernia repair.

269.    Adam's massive ventral hernia persists.

270.    Adam's abdominal pain continues.

271.    Adam remains restricted in his activities of daily living due to the persisting hernia, including how much weight he is able to lift.

272.    Adam is permanently scarred on his abdomen.

273.    Adam continues to experience neuropathy pain around the areas of his abdominal scarring.

## **OPEN WOUNDS**

274.    Outside of the wounds addressed above as they relate to the forearm and abdomen, Adam's open chest wounds needed to be addressed.

275.    Upon his initial visit to the Mayo Clinic on February 1, 2021, the chest wounds remained open, and he dressed those, and his fistulous wound, himself.

276.    In September of 2021, PMR and Plastic Surgery were consulted for recommendations on Adam's persisting, nonhealing chest wounds.

277.    During Adam's hospitalization for his fistula surgery, the Mayo Clinic determined it would attempt excision and closure of his chest wounds.

38

278.    The plan was to initiate non-contact, low-frequency ultrasound, debridement, and wound cares, which would occur three times daily pending response and hospital course, which began while he was hospitalized for the fistula takedown surgical procedure.

279.    Then, on November 2, 2021, Adam underwent excision of the left chest wound with advancement flap closure and excision of the right chest wound under general anesthesia at the Mayo Clinic.

280.    By November 23, 2021, Adam's left chest wound was draining.  The cultures grew staphylococcus aureus – he had another infection that required antibiotic treatment.

281.    Adam has permanent scarring on his chest, which appears pinkish/purplish. He also has a divot on his chest due to the nature of the GSWs and the treatment therefore.

## RETAINED BULLETS & BULLET FRAGMENTS

282.    Nearly two years post-shooting, in June 2022, Adam was suffering from the bullet fragments that remained lodged in his right back and left anterolateral costal margin.

283.    The lumbar bullet fragment was particularly painful when Adam was lying down to sleep.

284.    It was determined that it was reasonable to pursue excision of the two superficial bullet fragments under local anesthesia and sedation.

285.    Adam underwent bullet removal of his right lumbar back and left costal margin on August 16, 2022, at the Mayo Clinic.

286.    Additional bullets and bullet fragments remained in Adam's body.

287.    In the fall of 2024, Adam reported bouts of dizziness, brain fog, stomach issues, and constipation.

39

288.   Adam's September 2024 blood draw showed elevated lead levels.

289.   Due to his elevated lead levels, it was recommended that Adam follow up with trauma surgery to discuss removal of the bullets and fragments.

290.   Initially, Adam was informed that it was too risky by North Memorial providers.

291.   Adam sought a second opinion at the Mayo Clinic.

292.   The bullets and bullet fragments remained in Adam, in part, due to his other complicated injuries.

293.   However, in the fall of 2024, Adam's pain continued at the site of the two dominant bullet fragments that remained in his body.

294.   Notably there was a bullet fragment behind the psoas muscle anterior to the right SI joint and another impacted into the iliac bone just cephalad to the right acetabulum.

295.   Adam's CT scans showed bony deformity on the roof of the acetabulum associated with the fragment, indicating an associated fracture.

296.   Adam complained of right hip pain, which had been increasing.

297.   The bullet in his hip negatively impacted his ability to walk.

298.   There were concerns regarding bullet removal given the state of Adam's ventral hernia and upcoming repair.

299.   However, Adam's pain and limitations relating to the retained bullets continued into 2025.

300.   Additionally, Adam had suffered from generalized joint stiffness and pain in his knees, hips, shoulders and other smaller joints – symptoms of elevated lead levels.

301.    Because of the pain and physical limitations, Adam again considered the surgical removal of the bullets and bullet fragments.

302.    On January 10, 2025, Adam underwent the removal of the bullet and some fragments of his hip and pelvis – but not all of them, as some were deemed unsafe to go after.

303.    Adam was informed that because the bullet fragments remaining in his body are not able to be surgically removed, there is little more to be done for him.

304.    Adam suffered femoral neuropathy post-hip surgery, which continues to date. This causes pins-and-needle sensations over large portions of his right thigh around the area of neuropathy.  To date, there has been no improvement.

## MENTAL HEALTH & CHRONIC PAIN

305.    As noted above, Adam's mental-health treatment post-shooting began while he was hospitalized at North Memorial.

306.    Initially, this was to monitor his mental-health symptoms and then to work towards talking about the July 12, 2020 shooting.

307.    On September 8, 2020, Adam was diagnosed with acute post-traumatic stress disorder.

308.    After the shooting, Adam continued to experience mental-health issues as they related to anxiety and depression, as well as post-traumatic stress disorder, history of substance abuse, bipolar disorder, and ADHD.

309.    Adam has worked to maintain his sobriety.

310.    Adam and his providers were mindful of when and how opioid pain medication was used and prescribed during his treatment course and, as such, Adam was limited in what medications he could take to alleviate his severe pain in any meaningful way.

311.    Adam also has worked to remain stable and on his medications for his mental-health issues.

312.    Adam benefited from medications, counseling with a psychotherapist, and coping mechanisms learned at his appointments.

313.    Adam's mental-health issues were complicated by chronic, severe pain.

314.    Additionally, Adam's mood has and continues to be impacted by pain, stress and PTSD.

315.    Adam's sleep was disrupted by nightmares

316.    Adding insult to injury, to treat Adam's physical injuries, he had to undergo numerous MRIs.   Those were difficult for Adam because the noise from scans he required reminded him of gunshots.

317.    Over two years post-shooting, Adam's pain continued.  The most consistently painful sites were his left mid-abdomen, midline abdomen scar, left forearm, and lower back. The pain continued to limit his activities of daily life and overall quality of life.

318.    Adam continued with appointments through North Memorial Mental Health Services for nearly four years, until summer 2024, when he transitioned his psychiatric and psychological care to Rhonda Johnson, LICSW.

319.    Adam transitioned his psychiatric care to Horizon Psychiatry in spring 2025. Prior to that transition, Adam's psychiatric medications were renewed and monitored through his primary care provider or at his follow-up appointments.

320.    Nearly four years after the shooting, Adam continued to endorse the following: intense fear, helplessness, horror to the shooting; significant psychological and/or physiological distress resulting from internal and external cues that are reminiscent of the traumatic event; intentionally avoiding activities, places, people, objects that evoke memories; and sleep disturbances.

321.    Adam continues to treat his mental health with weekly therapy appointments, as well as psychiatric care.

## MEDICAL SPECIALS

322.    Adam's medical costs for the treatment relating to his physical and mental injuries due to the July 12, 2020 shooting by Defendant Kusick amounts to several million dollars.

323.    Adam continues treating for a number of medical issues stemming from his severe and permanent injuries relating to the July 12, 2020 shooting.

324.    Adam's medical specials continue to increase.

## WAGE LOSS

325.    At the time he was shot, Adam was working as a welder for G & R Elevator ("G & R"), where he started in the Spring of 2020.

326.    Adam was earning $21.25 per hour at G & R. He had recently received a raise for good work performance.

327.    Adam had the opportunity to work overtime with G & R at a rate of $31.875 per hour.

328.    In just weeks of work at G & R in 2020, Adam earned $10,394.34.

329.    Prior to starting with G & R, Adam worked as a welder for Hoffman Enclosures, Inc.  In 2018, Adam earned $36,400.37 and in 2019 he earned $39,972.34, respectively.

330.    Due to the shooting and the injuries and treatment required therefor, Adam was out of work for approximately 4 years and 9 months.  He suffered significant wage and income loss during that period, in an amount exceeding $185,000.

331.    Adam's wage loss and loss of economic opportunity continue.

332.    In April 2025 Adam started as a student-worker at the ARCC Financial Aid Office, where he earns $15.00 per hour.   Despite this, Adam has continued to suffer significant wage and income loss due to being shot by Defendant Kusick.

333.    Due to the July 12, 2020 shooting and the injuries and treatment required therefor, Adam will continue to incur lost wages and loss of future economic opportunities, as he is permanently injured and remains physically restricted by his injuries.  He can no longer work as a welder and has had to go back to school with the hopes of eventually finding gainful employment that aligns with his physical restrictions and injuries.

334.    Adam will incur additional lost wages and loss of future economic opportunities as he furthers his education.

96093311.v1

335.    Adam will incur additional lost wages and loss of future economic opportunities with upcoming surgical interventions required due to the injuries he sustained on July 12, 2020.

336.    Adam's future lost wages and loss of economic opportunities up through the age where he can receive social security retirement benefits exceeds $1.5 million.

## COUNT I

### 42 U.S.C. § 1983 – FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiff v. Defendant Geoffrey Kusick in his individual capacity*

337.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

338.    By the actions described above, Kusick, under color of state law, by the intentional and objectively unreasonable use of deadly force, violated and deprived Adam of his clearly established and well-settled civil rights to be free from unreasonable searches and seizures and the use of excessive, unreasonable, and deadly force in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

339.    As of July 2020, it was clearly established that it was unconstitutional to use deadly force against an individual, such as Adam, who had taken no menacing action with a firearm and pointed it only at himself. *Partridge v. City of Benton*, 929 F.3d 562 (8th Cir. 2019).

340.    Adam was severely and permanently injured, and was forced to endure great pain and mental suffering, as a result of Kusick's unconstitutional conduct, and was thereby damaged in an amount yet to be determined, but well in excess of $20 million.

Case 0:25-cv-02025-JWB-SGE Doc. 1 Filed 05/07/25 Page 46 of 47

341.    Punitive damages are available against Kusick and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983).

342.    Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Adam P. Nelson prays for judgment against Defendant Geoffrey Kusick as follows:

1.    That this Court find that Defendant Kusick committed acts and omissions violating the Fourth and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983;

2.    As to Court I, a money judgment against Defendant Kusick for compensatory damages and punitive damages in an amount in excess of $20 million, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest; and

3.    For such other and further relief as this Court may deem just and equitable.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

96093311.v1

**ROBINS KAPLAN LLP**

Dated:  May 7, 2025

/s/ *Kathryn H. Bennett*
Robert Bennett, #6713
Andrew J. Noel, #322118
Kathryn H. Bennett, #0392087
Marc E. Betinsky, #0388414
Julie C. Moroney, #0504300
800 LaSalle Ave, Suite 2800
Minneapolis, MN 55402
Telephone:  612-349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
kbennett@robinskaplan.com
mbetinsky@robinskaplan.com
jmoroney@robinskaplan.com

***Attorneys for Plaintiff Adam P. Nelson***

96093311.v1